20-1084 et al. The City and County of San Francisco Petitioner vs. Federal Energy Regulatory Commission. Ms. Mapes for the Petitioner, Mr. Ettinger for the Respondent, Mr. Lievenberg for the Interviewer. Ms. Mapes, welcome back. Thank you. Good morning, Your Honors, and may it please the Court, this case again concerns FERC's open access tariff for providing service over its wholesale jurisdiction system, open access electric distribution system. The tariff at issue here, the part of the tariff at issue here is not ambiguous. It states that a tariff customer is eligible for service without intervening facilities when it meets the criteria for grandfathering in Section 212H of the Federal Power Act. FERC's central error here is simple. It refused to apply Section 212H of the Federal Power Act in its entirety to this tariff that explicitly referenced it, that explicitly incorporates it, and explicitly defers to it. Before FERC, the parties, including PG&E, filed a joint brief agreeing to the meaning of the tariff's references. They stated that the parties could not agree on the scope of grandfathering under 212H, that they knew they needed a commission decision as to that matter, and that a delivery or interconnection point would be ineligible for service under the tariff only if Section 212H would prohibit the commission from ordering wholesale service to that delivery point. And under FERC's Suffolk line of cases, which is the primary case law interpreting Section 212H, FERC would not be prohibited from ordering service to San Francisco. But FERC dodged construction of that statute. Instead of deferring, or instead of looking at the plain text of the statute, looking at the text of Section 212H, looking at how it interpreted 212H in the past, and interrogating and reckoning with that precedent, FERC instead stated that it was a reference intended to give certainty to the data as to which grandfathering would attach. Maybe there was some stricture as to class of customers, but it was not meant to refer to Section 212H in its entirety. Can I just ask a question about the joint filing? So, I thought it was interesting that, and this is JAS 613, the last sentence of the only full paragraph on that page says the intent of referencing Section 212H in the WTT as it pertains to grandfathering was to ensure that the commission's interpretation of the statute was incorporated into the WTT's eligibility rules. Yes, Your Honor. Which indicates that everybody understood that there was going to be an open question about how exactly the scope of 212H was going to be resolved in circumstances in this case. But what was intended by everybody was that whatever the commission's interpretation of the statute was, that interpretation would be read into the tariff. Yes, Your Honor, that was our intention. And while PG&E now states it was intended to be ambiguous, they joined that brief. I would further state that FERC has argued that San Francisco's interpretation of the tariff would frustrate the point of delivery framework of the tariff. That's not correct. The two are consistent. It is true that the tariff has a point of delivery framework and that San Francisco and other tariff customers must apply for service at each point of delivery from which it seeks service for PG&E. But we must demonstrate using the criteria of Section 212H that we are entitled to grandfathering or we own intervening facilities at each point of delivery for which we apply. So the point of delivery approach and San Francisco's approach to grandfathering are consistent. I would say once again that the Western Area Power Administration has a settlement agreement with PG&E which states that it may add new grandfather points of delivery, and it does so regularly. Like San Francisco, that is a, as we discussed, a customer with many small points of interconnection that was receiving service in 1992. And once again, this creates a discrepancy between two similarly situated customers that constitutes undue discrimination. I also think it's worth noting that FERC explicitly stated that San Francisco's interpretation was consistent with the interpretation in the Suffolk cases, which are the major cases in which it has interpreted the grandfathering provision of Section 212H. Let me just ask you a global question here. How would you best describe the impact of these two FERC decisions, the grandfathering case and the secondary service case, on San Francisco's system? What's the global impact of this on San Francisco's operation? Your Honor, I would say that it has created a constant struggle to connect the types of customers that San Francisco has served for decades. We transitioned to open access service, San Francisco did in 2015, under the understanding that loads served under the old IA would be served under the new tariff. That was explicit. And it has become clear throughout these cases that even when we install intervening facilities, San Francisco is then told that it needs to install primary facilities. So it creates layered barriers to service that make it very difficult. And can you, if you lose both of these, can you quantify for us in some way what its impact will be on San Francisco? I'm sorry, Your Honor, the question was if we lose both? Yeah, if you lose both, it's a hypothetical question. But if FERC's two opinions stand, can you quantify for us what the long-term impact is on San Francisco? Your Honor, I don't believe I have a monetary quantification. I don't believe I have a numerical quantification. I would say there are some immediate impacts. PG&E has spot network in the city, a certain type of network in the city, just can't take primary connections. So there are certain loads that will never be able to get connected. PG&E has trigger points that terminate service to some of San Francisco's old points in its tariff that it didn't deem eligible for grandfathering. So some of those, if they exceed capacity, might need expensive renovations or to be terminated. And we are also dealing with this additional tariff that's being contested at FERC, which PG&E mentioned in its brief, that would eliminate secondary service entirely, including terminating service to San Francisco's street lights and other small unmetered loads on, I believe, February 27th. You heard my question about an hour ago to Mr. Hettinger about the impact of all of this on the Hetch Hetchy arrangement and freeing, enabling San Francisco to compete. Did I overstate that? The impact on Hetch Hetchy's service of power? I don't think so, Your Honor. I think that San Francisco has a congressional mandate to bring Hetch Hetchy power into the city and use it first for municipal purposes. And that's what it's been trying to carry out and it's been very difficult to do. I don't want to put words in your mouth, but do these two decisions, are they inconsistent with that goal? Do they undermine that objective? These decisions undermine that objective, yes, Your Honor. And I would say that Congress was quite explicit in the legislative history and in the statute that it wanted San Francisco to be an alternative to private power purveyors like PG&E. It's prohibited from reselling Hetch Hetchy power for resale to a private entity. And so its mandate is to do what it's been doing in an attempt to serve customers in the city itself. Thank you, Ms. Mapes. Unless my colleagues have additional questions for you this time, we'll give you the remaining time for rebuttal. Thank you, Your Honor. Mr. Adegar. Thank you, Your Honor, and may it please the Court. There are three paragraphs of the Commission's orders that I'd like to emphasize quickly in my time. The first paragraph is the finding in the initial order, the 2019 order, paragraph 68. The Commission found in… Where is that in the JA? That is at JA 648. The Commission makes the finding that the tariff at issue here has a delivery point framework throughout. And there are other sections of the order that emphasize that as well. But the Commission made reference to the general rule of section 14.2 of the tariff. And this is at JA 393. And this is also the chart I think the Court was questioning about the intervening facilities are also listed on that same page. But at the top of that page, JA 393, the Commission made the finding that there is a general rule that under this tariff, the interconnection should be… That there should be intervening distribution facilities between… Mr. Adegar, can I just take you back to an antecedent point? You mentioned the tariff. You mentioned 14.2 of the tariff, okay? But let's just look at the language of it. It says that distribution customers must own intervening facilities. Now I'm quoting. Except in the case where an eligible customer meets the criteria for grandfathering in section 212H2. Well, that's 212H2. So, can you just explain to me how the phrase meets the criteria for grandfathering in section 212H2 doesn't incorporate the criteria in section 212H2? I've seen a lot of ambiguous language in the decades I've been at this Court. This is not ambiguous. What's… I don't understand how FERC got past this problem. I think the Commission explains more at paragraph 69 of the 2019 order at J.S. 649, is that this language should not negate what it found in other sections of the tariff. And I should add, excuse me, that that's what the parties agree it means, right? That's what San Francisco and PG&E both said it means. It was intended to incorporate the 212F standard into the tariff. So you've got the plain language of the tariff, and you've got the written agreement of the parties that that's what it means. I just… I'm having trouble getting past that. A couple points to that. First of all, footnote 154 of the initial order, the Commission recognized that the parties believe that precedent under… the Commission's precedent under section 212 should apply here, and the Commission flatly rejected that interpretation. But what about the language of the tariff? Well, first of all, we're interpreting a contract basis, right? This is… we're applying contract principles to interpret this. And you've got language, plain language, at least I think it's plain, and you've got the interpretation of the parties to it. What's FERC's basis for saying that's not what… the parties say that's what they intended. FERC says that's not what they intended. How can FERC do that? How can FERC say that isn't what the parties intended when the parties told FERC that is what they intended? The Commission has an obligation. Again, as the Commission explained in the footnote, the Commission acknowledged what the parties had agreed to here. That wasn't… the Commission didn't overlook that. And the Commission, of course, is in the best position to interpret its own precedent. And what the Commission has decided was that precedent doesn't apply here. And while that isn't what the parties agreed, the Commission explained in that footnote that the precedent applies to other sections of the Federal Power Act and not here. I guess I don't understand that conceptually because suppose you have two parties that come together in a contract and they say, we're defining a particular phrase, and the way we're going to define this phrase is by reference to the following decision of somebody. You know, decision A. It doesn't matter what anybody else thinks about that. The parties have already told you that decision A is going to define it. But the fact that the author of decision A might say, well, I never contemplated that it would govern that. That doesn't matter because the parties have said, we're going to operate in accordance with whatever decision A says. And that's exactly what the parties said here at JA 612 and 613 is that those kinds of Suffolk decisions, the interpretation of 212H, all of that is going to feed into the interpretation of the tariff. So I don't understand what room there is for the Commission to have a different understanding than what the parties themselves have already told us is their own understanding. Clearly from that joint brief, and I believe it's page three of the joint brief, while the parties did to a certain extent agree that the precedent should apply, and again, the Commission acknowledged that, clearly there was a great disagreement about what grandfathering meant in the tariff. And that's not in the statute. I don't think there was any disagreement about the tariff. I think there was a disagreement about how the statute would be construed. But I think everybody understood what the tariff was doing, and the tariff was incorporating the statute. As to that, I don't see any ground for concluding that there was disagreement. It seems like everybody had the same uniform understanding. And then they bracketed that, yeah, and I'm just quoting, what the settlement did not do was define grandfathering for purposes of the WDT. The parties were aware that they did not fully agree on the interpretation or scope of grandfathering under Section 212H, and that issue would need to be resolved. But that has been caveated. I would emphasize again that the language Your Honor just read, that the parties did not agree on grandfathering, and that's a word that's in the tariff, not in the statute. And the statute only refers to the two criteria. What are the criteria of 212H? They are that a state or political subdivision and that the entity is providing service on October 24th, 1992. There's nothing in that language that would help the commission determine whether this tariff should grandfather a class or existing delivery points. But FERC's precedent under 212F does answer that question. FERC's case law, suffix 2, answers that question. Now, FERC's response is, well, this isn't a 212F case. Of course it's not a 212F case. But the parties, the language of the tariff incorporates Section 212F into the tariff. I would add to that analysis. No, you don't have to add to it. What's wrong with what I just said? Well, I would point out in paragraph 28 of the rehearing order that the commission observed that there is a type of class application of grandfathering that PG&E does with these replacement agreements that's actually the same as San Francisco's approach. The difference is, is that the commission doesn't approve grandfathering in perpetuity for new or relocated delivery points. And given the delivery point framework of this tariff, the commission was reasonable to find, to make that finding. Can you just tell me once more? I'm sorry I asked the question, my initial question. I'm sorry I asked both about the language of the tariff and the intent of the parties, because we ended up talking about the intent of the parties. Can you go back to the language of the statute, I'm sorry, the tariff, and tell me what's ambiguous about, quote, except in the case where an eligible customer meets the criteria for grandfathering in section 212. What's ambiguous about that? If I may respond two ways to that, Your Honor. I think what the commission is finding, and this goes back to paragraph 69 of the initial order, the commission is looking at this language and finding ambiguity. The language does not simply say except where. Where is the ambiguity, Mr. Edenshaw? That's what I don't, I know the commission found ambiguity, but where is it? Okay. The language doesn't read except where an eligible customer meets. It's in the case where an eligible customer meets. And the second sentence to the tariff is also important. That begins with, to the extent an eligible customer intends to invoke the grandfathering provision, the eligible customer must do so as part of its application, and at that time must provide evidence demonstrating that for each point of delivery. And I think what the commission is finding is that it's striking that that doesn't read simply that evidence demonstrating it meets the criteria of 16 U.S.C. 824K. If it read something like that, it might be clear that a customer class is grandfathered, and the commission disagreed with that interpretation of this tariff. And in addition to all the other. And what about suffix two? And as the commission explains in paragraph 69 of the initial order, that the Suffolk-type precedent isn't sufficient to overcome that delivery point framework here, that's evident in section 14.2 and other sections. I get your argument. I hear your argument. So there was one point being made, I think you referenced it, and I know the commission has too in the briefing and in the orders, that it seems difficult to believe that there would be this kind of in perpetuity result. That is the result of Suffolk, right? That may be the result of Suffolk. Why is there even a may? I thought that is the result of Suffolk. I just don't want to get in front of the commission on this. There's a public interest component of section 210 and 211, and I just don't want to get in front of the commission what the commission would have determined had this been a case under those sections. I think, in fact, the commission makes this point explicit. But I think the result of Suffolk is that a class gets protected in perpetuity. If that's the way the case is applied, I just don't know that it absolutely would. There are other parts, like I said, there's a public interest component of those proceedings. This isn't one of those proceedings, and I just don't want to prejudge what that case would look like. But there is a class. I think the commission is acknowledging here that there is a type of class approach under Suffolk. Okay. My colleagues have additional questions for you. Thank you, Your Honor. Thank you. We'll hear from PG&E Intervenor Counsel, Mr. Levenberg. Thank you, Your Honor. May it please the court, Joshua Levenberg for Intervenor Pacific Gas and Electric Company. I'd like to turn to a couple of the questions that you asked the counsel previously, in particular the joint brief. So was the commission wrong that that's not what you agreed to? I think the commission is right in that what we agreed to was what Judge Srinivasan suggested earlier, was that we were going to let the commission determine when this issue came to the commission what that meant, how to interpret the statutory provision in light of the context of this case. The reason that I think that I might disagree with perhaps some of the hypotheticals that you were proposing before is that both parties were aware of the underlying precedent at FERC, the Suffolk cases. And before they entered into the agreement, before they filed the brief, in fact, the complaint that San Francisco filed in the fall of 2014 arose because San Francisco made an application to PG&E to apply grandfathering to all of its delivery points. San Francisco rejected that based upon its interpretation of 212H. San Francisco said we're relying upon Suffolk to say that they're all grandfathered because they're all in the class, and PG&E said that's not our interpretation. PG&E's interpretation embedded in the statutory – sorry, embedded in the tariff to refer to the statutory provision was to use a temporal delivery point approach, as the statute reads, which is in service as of that date, then you are grandfathered. But the new approach, which was the new wholesale distribution tariff, required intervening facilities on a going-forward basis. So PG&E's interpretation was any new applications are going to have to have intervening facilities, just like all of our other customers do. But this is new to you. You had a different agreement before where you didn't need those, but all other customers have been required to install intervening facilities. So if you don't have them as of the date the tariff becomes applicable, we'll leave them and serve them as is, but on a going-forward basis, you will need those. So do you disagree? I thought what the Commission had told us was that – what Commission counsel just told us is that the parties intended to incorporate the Commission's decisions. Absolutely not. I don't think that was an agreement at all. As I said, that dispute has been a dispute between San Francisco and PG&E since at the earliest, 2013, articulated between the parties, and PG&E's answer to San Francisco's complaint makes it clear that we do not interpret 212H to mean what San Francisco does. San Francisco insists that the statute must be read in light of, or you have to read in precedent into that interpretation, and neither the tariff nor the statute include the language that says class of customers. The last sentence of that paragraph on 613 says, The intent of referencing section 212H in the WTT as it pertains to grandfathering was to ensure that the Commission's interpretation of the statute was incorporated into the WTT's eligibility rules. Right, and I think from our perspective, that was a prospective interpretation. When it gets to FERC, we will live with whatever the decision is. That decision was that the prior precedent doesn't apply in this case, and that's why we're here. Wait, it says. So let me see if I understand this. So you think the language, here, well, let's see, to ensure that the Commission's interpretation of the statute was incorporated into the eligibility rules, right? You say that what you were talking about there was whatever the Commission's future decision was? Pardon me, I couldn't hear the end of your. I'm sorry. This is referring to a future Commission interpretation, not the current one? Correct. I mean, as we discussed in our brief, the chronology of events was such that the decision to include that language in this. But I don't understand why. Why would the parties, why would that even be on the table? I don't get it. It arose because in 2013, PG&E filed a new wholesale distribution tariff. And as part of, while those negotiations were ongoing, the dispute arose about how to interpret grandfathering, the grandfathering clause of 212H. Despite the fact that the complaint was filed. I'm sorry to interrupt you. I'm truly trying to understand your argument. Why would the parties have to agree that a future FERC decision was incorporated into the tariff? Wouldn't it automatically be? When the FERC interprets the tariff, that's the interpretation of the tariff. The parties don't have to agree on that. The reason was because it was still being disputed. So that was a live issue in a FERC proceeding. In order to settle what was the wholesale distribution tariff litigation, and that settlement wasn't approved by FERC until the day before the new tariff became effective for purposes of San Francisco. The only way to settle that was for both parties to agree to put a placeholder in there. What do you think? Had PG&E thought that the president applied, we wouldn't have been litigating from 2013 until today. We would have said that the president applied. The other side of this is, okay, so San Francisco is on the other side of the screen. What's Ms. Maid going to say when she stands up here and I ask her what she thinks about what you just said? I mean, I think their brief makes it clear that they think she agrees with this. They think that the tariff embeds the FERC precedent that was distinguished. That's the approach that San Francisco has been taking, but that's not what the language of the tariff says. The language of the tariff was negotiated after the complaint was filed. Do you have any other evidence to support this interpretation of the language? I don't mean the interpretation. I mean, do you have any other evidence you can point us to that this is what you meant? I mean, as your client meant. In the record, I think it's just a chronology of events. As I said, we filed a tariff in 2013 to require intervening facilities. San Francisco then applied for service saying all of our points are grandfathered because we don't have intervening facilities and we're grandfathered. PG&E rejected that approach and said you're not grandfathered. We're not using a class of customers approach. That approach is not applicable here. San Francisco then filed a complaint saying we want FERC to decide is it class of customers or not. Do you read the commission to have actually carried out what even you were saying was the intent of the statute, which is to ensure that the commission's interpretation of the statute was incorporated? I do. Because I thought the commission made pretty clear that it wasn't interpreting the statute. As I said, I think San Francisco took an approach that was the statute should be interpreted through the lens of Suffolk. And PG&E's interpretation was that the statute should be interpreted through the lens of sort of the face value of it, which was drawing a temporal line in the sand. So in 1992, when Congress amended the Federal Power Act, it stated that from this point forward, intervening facilities would be required. But any existing interconnections that did not have intervening facilities were grandfathered. That's PG&E's approach. And so that's when the commission issued its order, that's the approach that PG&E had proposed and proffered throughout. Let me ask my colleagues if they have any additional questions for you, Mr. Levin. If you don't mind, I'd like to at least respond to one of Judge Tatel's questions to San Francisco about what the impact is. I think it's worth mentioning that in the grandfathering context, there has been no impact. I'm sorry. In the grandfathering context, what? In the context of you, I think you asked what's the impact of the outcome of both of these cases, the primary versus secondary case and the grandfathering case. I think in the context of the grandfathering case, there's been no impact. So the fact that FERC ruled in favor of PG&E has not led to any changes at San Francisco. San Francisco sort of had in its briefing a suggestion that there was off-tariff service or this alternative. In fact, all of the delivery points that were previously served under the prior 1987 interconnection agreement have currently been served under the wholesale distribution tariff. There have been no disconnections. There have been no concerns where the PG&E was going to say you're not grandfathered and therefore you're converting it to PG&E's retail service. There are zero examples of that. So nothing has happened. There has been no impact to San Francisco because of the grandfathering decision. With respect to the primary versus secondary decision, which is, you know, there's an overlap. I think the San Francisco, there has been, we have had disputes, and I think some of them are raised in San Francisco's pleadings. But I think, you know, ultimately what I think is important to understand, which I think appears in our briefs, there's nothing that prevents San Francisco from providing secondary service to its own customers. It's a utility. So that case seems to me to suggest when San Francisco says we don't want to do this because it would be expensive or we don't have room, the argument I think is that why should that responsibility be foisted upon PG&E? Why doesn't San Francisco take on the role or responsibility of providing secondary service to its own customers in the way that other utilities do? What do you mean by developing intervening? Pardon me? By developing intervening, right? Its own intervening. Sorry, I couldn't hear you. How would it do that? All utilities have the opportunity to provide whatever facilities they want. So if you want to provide a little bit. So it would develop its own intervening facility. Absolutely. If PG&E only provides primary service on a going forward basis, just like every other utility in the United States, San Francisco can step down with transformers and provide secondary service to its own customers. The question is why should PG&E provide secondary service to San Francisco's customers directly? I think the question is why should PG&E continue to? Because it's not as if the world started without any secondary service before. Absolutely. If the secondary service wasn't in existence, then the question is whether it's going to continue. Okay, thank you, counsel. Thank you. Appreciate it. Ms. Mapes, you have the rest of your time remaining, which I don't know exactly how long it was. I think it was around seven minutes. Thank you, Your Honor. Well, I'll briefly address Mr. Levenberg's last point first, which is that it gets to the heart of why FERC exists. The reason San Francisco can't easily provide secondary service to its own customers is that it would have to build a duplicative distribution system throughout San Francisco for the most part, and by and large we've, as a society, judged that to be an inefficient use of resources. San Francisco actually does own distribution facilities at various points within the city. For instance, it serves, and I believe this is in the record, the new Hunter's Point development in a certain portion of the city using its own distribution facilities in an old space-constrained city like San Francisco to serve streetlights, libraries, police stations throughout the city would truly require building a duplicative distribution system. You'd have two sets of wires running under the streets. I have a few other points I wanted to make. The first is related. Could you address the party's joint submission? Absolutely, Your Honor, and unsurprisingly, I do not agree with Mr. Levenberg about our intent. I think probably the best evidence in the record as to that is if you look at the briefs that PG&E filed before the ALJ, who heard this case at hearing at the commission and its briefs on exceptions to the commission, when PG&E argued whether or not its interpretation fit within FERC's precedent in those briefs. It did not argue that FERC's precedent was irrelevant to those briefs. It argued that its interpretation fit that precedent. It may also have argued that that precedent should be overturned if the commission viewed differently. It did not argue that somehow 212H in this tariff exists in some kind of state divorce from the commission precedent, and that argument at no point appeared in the record until it appeared in the commission's order. Another point I wanted to make was that Mr. Levenberg mentioned that the statute, in his view, refers to points of delivery. I would point to the language in 212H, which refers to such ultimate consumer that was receiving power on October 24, 1992. It does not refer to point of deliveries. It does not refer to locations. And I believe the commission's Suffolk decision, while not directly at issue here, was informed by that such ultimate consumer issue. I also wanted to address the contention that we haven't suffered any harm from the grandfathering decision. I would note that the new wholesale distribution tariff case that PG&E references in its briefs actually does terminate service to a very large category of load that PG&E has argued is not entitled to grandfathering, and that is its streetlights and other small municipal loads that have traditionally not been metered. PG&E has, since 2015, classified that load as not qualified for service under the wholesale distribution tariff and not entitled to grandfathering, and it now seeks to terminate service to that load, originally at the end of the year, but I believe it is filed for a stay of a month or two. And its concept is that that load would become PG&E retail customers instead. And I wanted to offer one analogy that I thought might be helpful on the issue of the point of delivery framework in the tariff. I believe Mr. Ettinger discussed, well, the tariff doesn't just say you apply for grandfathering. It says you apply for a point of delivery. And that's true, but I would note that the tariff contemplates that customers might apply for many points of delivery and they might apply for many points of delivery at one time. So, for instance, if San Francisco submitted an application for 10 points of delivery and five of them were privately owned coffee shops and five of them were public libraries, San Francisco would have the obligation under the tariff to show it owned intervening facilities for those privately owned coffee shops, and under San Francisco's interpretation, it could then show evidence of eligibility for grandfathering for the five libraries. And that's how our interpretation gives meaning to the point of delivery approach. And if there's no other questions, I'll thank you for hearing this case study. Could you just repeat the last point you were making? Yeah, absolutely. And so the point I was trying to make there is that under the tariff's point of delivery approach, grandfathering belongs to the ultimate consumer that is taking service at a particular point of delivery. So if we submit multiple applications, five of them might be for customers like libraries that are eligible for grandfathering, and five of them might be for customers like Starbucks on private property that are not. So we would need to show that we owned intervening facilities for those five Starbucks, and we would also show that we met the criteria of 212-H as to grandfathering for the five libraries. So we would be presenting evidence for each point of delivery, but it may be different for each point of delivery, and we may be eligible for service for different reasons. And in fact, Sam, as I think you pointed out in the briefs and in the record, San Francisco obviously has filed applications that involve showing that they're intervening facilities because the grandfathering issue just doesn't even come up with some points. That's right, Your Honor. And the points at issue here, we have argued, are entirely eligible for grandfathering, but that is effectively why we submitted them in this application. There are other points of delivery that were never part of this case where it's clear we own intervening facilities. And therefore, grandfathering doesn't even come up. That's right. Thank you, counsel. Thank you to all counsel. We'll take this case under submission as well.
judges: Srinivasan, Rogers, Tatel